Good morning. Good morning, Your Honors. May it please the Court, my name is Wayne Arnett. I practice in Tempe, Arizona. With me at counsel table today is my brother and partner Mark Arnett and Randy Bachrach, co-counsel with us as well. This is an interesting case about an unusual insurance policy. This policy, unlike most of the ones that you're probably familiar with, began, is really in three parts. A base policy which covers inpatient hospitalization. And it has a high deductible, a $1,000 deductible. And the idea of that base plan is that it will cover if your person actually has to go into the hospital and also if you have to spend the night, if you're confined, according to the terms of the contract, in a daycare or a day surgery facility. So that the base plan, the idea of the base plan is that it will cover the high dollar things. That if you have to be hospitalized and your bills are going to be quite high, then the insured will accept a $1,000 deductible. Then it has, they sold Mr. Walter two other riders to the policy, both of which have zero deductibles. The first is a physician's visit rider and the other one is an outpatient medical expense rider. Both of those riders have no deductible. The base policy has a $1,000 deductible. One of your arguments, Mr. Arnett, as I recall, was that there was a new superseded OME rider. Yes, there was. I checked. I know the one was promulgated, but their argument is that your guy never bought it and that the group policyholder would have to approve it. I've tried to find a record where the group policyholder of that particular policy approved it and I can't find it. Well, there's only one group. Mr. Huber, a client that we had before, belonged to the same group. It was the same organization. Maybe the same group, but there are different policies and they're saying that they never approved the rider for this particular policy. I looked and I can't find that they're wrong. Can you set me straight? Well, I think that the evidence is this, that there was a, this is a, well, and that's an important thing to know, to understand about this policy. The certificate, well, the certificate of insurance by its own terms says that it is not the policy and that the language in this certificate is not controlling. The language that is controlling is in a policy which we have never seen, which has never been produced by the defendants in this case. That's the master policy issued to the group policyholder. Now, the group policyholder we know is the same. We know that the rider number is exactly the same. It was revised a month before Mr. Walter purchased this coverage. And so, I think there's at least an issue of fact there about whether or not that rider was in effect at the time because it was revised a month before. It was approved by the Department of Insurance later, but we've cited some case law that says when you change a group policy, and this is clearly a change in the group policy because that rider was amended. Well, I have a, I, Kimberly Nelson filed a declaration that said the group policy was not amended. It was a different policy that this rider went to and as far as I can tell, that's not contradicted. Well, I don't, I, maybe, I didn't, it's not my understanding that, let me pull that. August 26th, 2003. To me, this is an important point because if you're right, the new riders enforce, you win. I have her affidavit here in front of me. I think it's at tab 50 with respect to that coverage. And she, she, she does say that Mr. Walter did not purchase that. That wasn't the one that they, he was given. Okay, and I acknowledge that. He wasn't given this one. But I don't think she says that that rider went to some other plan or some other group. At least I didn't, didn't remember that. Paragraph 17 says these new coverages did not apply to existing policyholders who did not apply for or pay for this coverage. My recollection was she talked someplace that the new version provided for a higher premium which Mr. Walter did not pay. But that is what she said. And I, what she doesn't say is that Mr. Huber was in a different group than Mr. Walter or that he was covered by a different policy, a different master policy. He wasn't. He was in the same group. He was covered by the same policy. And both of those riders had the same number on them. And they were, they were designed. Are the premiums identical? Excuse me? Are the premiums identical? And we have here a declaration that says the premiums are different. Is there anything to contradict that? Well, Mr. Huber was of a different age than Mr. Walter and he paid a different premium. I don't remember. And maybe I'm going to reserve as much time as I can for rebuttal. Maybe in my rebuttal I'll be able to bring that up if I confer with counsel and let you know what's in the record with respect to that. Difference. The point of this whole policy, though, is that between the, well, and let me say this. I'm not sure for purposes of this appeal it matters really which OME rider applied. It's certainly under the old OME rider he had coverage for outpatient medical expenses that should have been covered under that rider. And nowhere in the contract does it say what they did. And that is we determine whether something might be covered under the base policy. And if we determine it is, then we charge the $1,000 deductible. And we don't even look to see if it might also be covered under the outpatient medical expense rider. So I want to point out the, that they argue that they didn't breach the contract. That because they had, they eventually paid the claims. Well, the contract says they'll pay them promptly. The law requires them to pay them promptly. We know that many of the claims got delayed. And I want just to look at a couple of those. They claim that it was not a human being that determined this, so therefore there can't be any intent that was formed. We simply delegated to our computer the claims responsibility. But some human being made that decision to delegate that to a computer. Now, an insurance company can, I think, if it chooses to, delegate claims responsibility to third parties. And I suppose to a computer itself. But certainly the company remains responsible for the acts of that computer if it wrongfully denies claims. And it was human beings that created that computer program and had a responsibility to manage it. Now, let's look at. Do you think the computer screw-up was malicious or an accident like they come forward with? I'm not convinced that there is any evidence of a computer screw-up at all. Did they come forward with evidence that it was a computer error? No. Where did that come from? That came from this affidavit. Well, that's evidence. Well, it is some evidence. And what she said is that it is her understanding that there was some sort of a computer glitch. And she doesn't describe what that was. She doesn't. And she admitted, and when we took her deposition, we quoted extensively from it in our reply brief, she admitted that she had no personal knowledge of this computer glitch. It was something she just heard about from someone that she couldn't identify and that we can't cross-examine. So, I mean, that's to say that on summary judgment we will simply accept as a fact that there was a computer glitch that caused this problem. I don't think you can do that under those circumstances. Rule 56 does require personal knowledge of the facts that are there, and she admitted in her deposition she did not have that personal knowledge. And so I just don't think that can be accepted. But even if it is, a computer, even if you accept the proposition that a computer made a wrong decision, let's say, for example, if we go to page 9 of the reply brief, they set forth five claims that they admit were delayed. Let's just take the first of these, Dr. Godel. Dr. Godel's claim was denied. It was presented, first of all, and submitted in March. And on May the 30th, it was denied as uncovered service under the base plan, according to them. It was actually the base plan isn't mentioned at all in the explanation of benefits. But they show that the plaintiff called a week later, on the 6th of June, to complain about the fact that he had a physician's visit that was denied, and he had the physician's visit writer. He talked to them again on July 3rd and again on August 11th. Each of those times, he spoke to a human being, not a computer, and that human being understood what happened, understood that his claim got wrongfully denied, and that they would try to correct the problem. And it didn't get corrected until the next October. Now, is that a breach of contract? This isn't a computer making some decision here. That's a human being who understood and didn't take any action to change things until October, when Mr. Walter finally threatened to sue if something didn't happen, and they finally paid these five delayed claims. Just to point out also among those same items, there is evidence, and it's in tab 47 of our record, at page 97, the bill of Dr. Calhorn at the top of page 10. It says it was denied. They claim in their brief that it was denied as uncovered service under the base plan. If you look at the actual denial, it says, and not covered under rider. And so it was pretty clear that they understood that he had the rider when they denied the claim in July, and that the computer understood that. At least that's what was printed on there. I see I've got a yellow sign. I would like to reserve the rest of my time for rebuttal, if I may. You bet. Thank you, Mr. Nett. Ms. DeMarchi. Good morning. May it please the Court, my name is Kim DeMarchi, and on behalf of Lewis & Rocha, I represent the Appalese United Benefit and Central Reserve Life Insurance Companies in this case. Counsel, I have a question about jurisdiction. Certainly. I'm concerned about the amount of controversy in this case. The original complaint had the phrase in excess of $50,000 as a requested claim for damages plus fees. And the plaintiff at some point offered to settle the case for $50,000, including fees and all forms of damage, which the defendants rejected, presumably because it was too much rather than too little. And the actual damages are less than $1,000, as I understand the record before us. How do we get over $75,000 as the amount of controversy? In that regard, Your Honor, it's important to keep two things in mind. And the first is the standard with regard to which a court facing either an initial complaint under diversity or a petition for removal has to look. The question is not, as the appellant seems to suggest in his brief, what the plaintiff is likely to get at the end of the day on the merit of those particular claims. The court is to assume that the plaintiff can prevail on the claims and then to say what are reasonable amounts that would be awarded if the plaintiff can bear the burden of proof. And so ---- Correct. But what is in excess of ---- I mean, my concern is that every time a complaint says in excess of any amount, it theoretically could be in excess of $75,000. But that can't be the rule. If it says in excess of $12, well, theoretically that could be more than $75,000. So how do you get from $50,000 to $75,000? And, Your Honor, that's not the rule that we're urging here. The other thing that it's important to remember is what that $50,000 mention in the complaint was talking about. It wasn't talking about the entire amount of recovery in the case. It was talking about the amount of compensatory damages that were being sought, both unpaid medical bills that the appellant claimed should have been covered under the policy, bad faith, emotional distress types of compensatory damages. But then on top of that $50,000, there's a claim for attorneys' fees. And this Circuit has repeatedly held that when attorneys' fees are recoverable under contract or under statute, they're included in the amount in controversy. That gets us another $16,000 to $17,000, assuming the low end of a contingent fee, assuming a one-third contingent fee. And there's been no evidence presented, no response of any kind suggesting that the plaintiff's attorneys were doing anything other than a contingent fee or that it would have been any less than 33 percent. So now we're at $67,000. And what's left is a claim for punitive damages. The plaintiff needs to be ---- The plaintiff says in its brief that the $50,000 or in excess of $50,000 includes punitive damages. Your brief says otherwise. I don't know what the Maricopa local rule actually says, and the district court opinion isn't clear on this. So you focus right on the thing that has me a little bit adrift. Well, and the complaint is instructive in this regard. If you turn in the excerpt of record to tab 1, which is the notice of removal, it has the complaint attached. And the complaint in paragraph 19 says plaintiff has suffered and will continue to suffer anxiety, worry, mental and emotional distress, et cetera, all to plaintiff's general damages in a sum in excess of $50,000. It then goes on and in the subsequent paragraphs, paragraph 20 requests attorney's fees, and then it goes on in the prayer for judgment to request punitive damages. Now, the certificate on compulsory arbitration is the other document that may lead to the confusion. All you have to say in Arizona to the court is I'm either above or below 50 total, which means I either have to go to arbitration or I don't. And that's where there's this undifferentiated $50,000. But the complaint is very specific in tying the $50,000 plus to compensatory damages, which brings us to punitive damages. And assuming that my math is correct, it would only have to be a punitive damages award of about $8,400 in order to bring this case above the amount in controversy required. And so what the law tells us is that we have to look at punitive damages awards in similar cases. We presented two similar cases in Arizona, both with very low compensatory amounts. The Hawkins case is a very ---- Are they similar factually, though, in terms of ---- They were both cases where there was a very small amount in controversy in terms of the benefits denied. Hawkins, it's literally a few hundred dollars' worth of difference in the value of the car. But it is here. In the Fulaski, I think it's the Fulaski case, the other case, all the benefits were actually ultimately paid. It was just a dispute about the practices that got to payment. Both of those were at least a million dollars in damages. Fulaski was a million. The Hawkins case is $3.5 million. The defendant or the plaintiff, excuse me, himself presented evidence of a study of average punitive damages verdicts. Presented it to the court below to show that it was rare to be able to recover. But that's not the standard. The question is when people recover, what do they get? And that survey had a median punitive damages award of $40,000 in all cases. And I'm sorry, I skipped a part of your question, which is the Hawkins-Fulaski cases both involved allegations like the allegations that Mr. Walter made below and has continued to make here of systematic misconduct by a national insurance company. A pattern and practice of routinely denying claims, routinely undervaluing claims, which are precisely the kind of allegations that are made here. And if you look at the standard of punitive damages under Arizona law, a jury looks at that kind of conduct to determine whether punitive damages are appropriate. And then they're asked what is an amount of money that would adequately deter this defendant and other defendants from doing the same thing. And we're talking about national insurance companies here with significant revenue streams. And what that means in the land of punitive damages is significant punitive damages awards because those are deemed what is necessary to deter future conduct. Can I change the subject for a second? Certainly. Your contract requires that you pay the benefits promptly upon receipt of proof of loss. Correct. And you didn't do that and you blame it on a computer error. How did you win the breach of contract claim? The court found that the real issue with regard to the payment of claims, given that it wasn't intentional in any sense, was whether it constituted bad faith. And let me ---- It was a computer error. I don't understand how you won the contract claim. Because we did pay the claims as promptly as we could. The majority of the claims were paid. Well, and here's where it's important to understand exactly how this computer error worked. And Mr. Arnett made some reference to this with regard to what evidence there was. There's certainly Ms. Nelson. And the problem of all institutional defendants is that someone has to come forward and speak for the company and figure out what happened. And in this case, that's Ms. Nelson. She's the one who was able to go back through the records to determine what had happened based on the records to tie that to her institutional knowledge of systemic problems the company was having with its computers. And if you look, all of the evidence points to the explanation that she gave, which is that the computer knew that Mr. Walter had the base plan. It knew that he had chosen one of the optional additional coverages, the outpatient medical expense rider. What it couldn't seem to get was the physician visit rider. And so all the claims that are delayed are claims that are payable under the physician visit rider. Regardless of the reason, the contract doesn't say everything is paid promptly except things that the computer doesn't understand or accept a certain kind of claim. I have the same issue as Judge Silverman with respect to the breach of contract as distinct from bad faith. The breach of contract can be in perfectly good faith, but if you don't do what the contract says, you still breach the contract. Well, and then I guess the question turns on promptly. And whether a few months of trying to figure things out isn't prompt. And why is that a summary judgment call rather than a question for a jury? Well, interpretation of the language of a contract is generally a question of law for the court. So how long were these payments delayed? They were months? Months. There's one that's two-and-a-half years, and I don't remember which one it is, and it's a fairly small one. And I was going to say, it's hard to imagine as a matter of law saying that that's prompt if you want us to be saying as a matter of law what prompt is. Well, and then that raises the question, of course, of whether there is any damage, which would be the other element of breach of contract. It's not enough that promptness didn't happen but that Mr. Walter was, in fact, damaged in some way. And he was paid completely all of the coverage to which he was entitled. For just a moment, it looks like I've got a bit of time. I wanted to touch on one of the coverage issues. Mr. Arnett said a few moments ago that it didn't really matter which of the outpatient medical expense riders governed in this case. It does. It matters quite a lot because of the language of the outpatient medical expense rider that applies. And it's important that the court be looking at the right one since they're both in the record. The right one is in tab 45, the first exhibit, which is the first blue sheet. And it's pages 6. Page 6 is the outpatient one and page 11 is the physician visit one. When Mr. Walter bought this insurance, he was eligible to choose to buy the insurance because he was a member of an association. And the basic insurance is hospital and surgery, even if that surgery is in a day surgery facility, hospital and surgery. And if you wanted to, you could buy extra things. There was a whole list of extra things you could buy. Mr. Walter's application is in the record. It shows that he had other choices, including some he considered and scratched out. And the one that he picked, the outpatient medical expense rider, very expressly says we pay for miscellaneous covered services. It lists miscellaneous covered services. And then it says charges for services and supplies not specified in this rider, things not on the list, are not covered. And that's important because, Judge Clifton? I think that is important, but as I struggled through the specific claims, there's one, for example, for a biopsy. And the word biopsy doesn't appear on the list, but things that probably go with a biopsy do seem to appear on the list. How are we supposed to sort that out? I mean, how is it that nothing in connection with the biopsy appears to be covered because the word biopsy doesn't appear on the list? Isn't that going to entail some form of anesthesia or local anesthesia or dressing, sutures and supplies? And if it did require those kinds of things, that part of the bill would be covered. That's essentially what this does. Well, that bill would be covered if the statement from the doctor happens to use the magic word. This isn't like the other one that actually lists codes. And if you don't hit the right code, you may be in trouble. This lists somewhat more generic descriptions. I don't know what a biopsy entails, but my guess is that it probably does include some of these things. How are we supposed to figure that out? Because the doctors are supposed to tell the insurance company what they're charging for. That's the importance of those codes. They're not picked by the insurance company. The other one has the codes. This is the outpatient. The PV lists specific codes. The outpatient rider does not. It uses these generic terms as I read it. The terms correspond to some of the other codes. There's a reason those codes are five digits. There are a lot of them. And when health care providers bill, they can bill very specifically for these kinds of services. Let's take the outpatient skin cancer procedure as an instance. In his briefs, the appellant has argued that the outpatient skin cancer procedure, which happened at a day surgery facility, shouldn't have been paid under the base plan. It should have been paid under this rider. And that's sort of a dangerous argument for the appellant because this rider doesn't cover that surgery. It would arguably cover one piece of it. There were three bills generated by that surgery. The day surgery facility had a facility charge. The doctor who performed the surgery had his own bill for his services. And the pathologist had his bill for his services. The only one of those things that would be on this list is pathology, not the surgical center fee, not the doctor's fee. And if it were under only the optional medical expense rider, that's exactly what the insurance company would do. They would take the bill. What is the bill for on its face? Is it on the list? Yes, it gets paid. No, it doesn't get paid. There are other versions, other riders, other ways one can do this. The revised rider is actually significantly greater, and as Ms. Nelson's affidavit does clearly state, more expensive coverage. I'd like to touch for just a moment on that. Okay. Half a moment. On bad faith, it's important to remember the standard under Arizona law, which requires a measure of intent. And it's not the company's defense that its computer can't have a subjective intent. When an insurance company decides to do this by computer programming, it's our job to make sure we're doing that responsibly and we're fixing errors as soon as we can. And the district court here found that there was not a scintilla of evidence, and that's the district court's word, not mine, that there was any kind of bad faith in the amount of time or the way in which the computer programming error in this case was resolved. Thank you, Ms. Demartian. Mr. Arnett, back to you. Thank you. I looked in the record about the evidence on the difference in the cost between Mr. Huber's and this one, and it's at tab 53 on page 6. In our pleading, this was our reply to the response to the motion for summary judgment, we set forth the cost that Mr. Huber paid, and it actually shows that even though he was older, he paid a lower premium than Mr. Walter did. Now, what we don't have is the exact breakdown as to what it cost per base policy as opposed to each of the riders that were purchased, so that simply isn't broken down anywhere for us to even have that. But certainly that's some evidence that I think would at least give us an issue of fact as to whether or not this was, in fact, more expensive. The certificate on arbitration makes it clear, I think, if there was any uncertainty about it, about whether the compulsory arbitration certificate included punitive damages. But you do have the complaint, which says the problem with that argument, I think, is that it's true that the compulsory arbitration, quote, includes punitive damages, but they both say in excess of 50. And that can be true, but the only way both of those can be true is if, as stated in the complaint, the complaint without punitive damages is in excess of 50. So the complaint with punitive damages is still in excess of 50, like the arbitration certificate says, but way in excess of 50, something above the 50 if they're to be collected. They're not mutually exclusive. I think you're right. The closest thing we have to a specific statement appears to be in the complaint, which says you get to 50-plus without punitive damages. Right. And then we wind up having to figure out, well, what would that add? And you figure that out by learning, as the other courts have done, that there was an offer to settle this case for $50,000. Yeah, but that suggests that there's a litigation value of something higher than that, because people rarely settle for 100%. And defendants aren't in the business of paying 100% to settle. They're in the business of discounting the claim somewhat. That's why they defend the cases. And in most of these cases, they don't settle for the opening demand either. So that's what was before the court. That's what's here on the de novo review on jurisdiction. That's it. Now, I have one comment to make about the Pulaski case that was cited as a similar case. I'm painfully aware of this Pulaski case. It happened to be mine. It was a case where we did have a million-dollar punitive damage verdict. What they didn't point out was that that verdict was taken away by the court of appeals in that case, and it turned out to be zero punitive damages. And it was a case that wouldn't have ended up, I guess, here and according to our court of appeals in Arizona, it should not have been submitted to the jury on punitive damages. Court of appeals taketh away, but sometimes the court of appeals giveth. Sometimes, that's true. On the miscellaneous medical expense, Ryder, I want to clarify this issue in the moments that I have left. The writer itself, the writer that was sold to Mr. Walter, clearly says that it will cover miscellaneous expenses, and then it defines what those are, and it's in the paragraph that says miscellaneous covered services and supplies. It says miscellaneous covered services and supplies are charges incurred at the physician's office or the emergency room or charges incurred at a diagnostic or reference center. And then it says, and then there's a list that follows it, but nowhere in this contract does it say we cover only the items on the following list. It says we cover miscellaneous expenses incurred at the doctor's office. So to meet that definition, if they're incurred at the doctor's office, then we've met that definition, and nowhere is there language that says, unless it's on this list, we do not pay for it at all. And that's part of the problem we have with this contract, and that's an issue to be decided by you. Your time is up, Mr. Arnett. Thank you very much. Thank you. The case just argued is submitted. It's nice to see some Maricopa County lawyers here. Bye-bye. Thank you, Judge.
judges: Silverman, Graber, Clifton